UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GENE A. LEFEBVRE,

                                Plaintiff,

        v.

JOHNATHAN P. MORGAN, et al.,

                                Defendants.

Case No. 14-CV-5322 (KMK)

<u>OPINION AND ORDER</u>

<u>Appearances:</u>

Gene A. Lefebvre
Wappinger Falls, NY
*Pro Se Plaintiff*

Julia Lee, Esq.
New York State Department of Law
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

Plaintiff Gene A. Lefebvre ("Plaintiff") filed the instant Amended Complaint against

Johnathan P. Morgan, Robert E. Levin, Robert K. Palmer, James Barron, Karim Adeen-Hasan,

and Daniel J. Cunningham (collectively "Defendants"), bringing claims against Defendants

under 42 U.S.C. § 1983 for violations of his constitutional rights to due process, privacy, and

free speech.  Before the Court is Defendants' Motion To Dismiss the Amended Complaint

pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motion").  (*See* Notice of Mot. (Dkt.

No. 20).)  For the following reasons, Defendants' Motion is granted.

I.  Background

A.  Factual Background

The following facts are drawn from Plaintiff's Amended Complaint and are taken as true for the purpose of resolving the instant Motion.[1]

1.  The Parties

Plaintiff has worked for the New York State Office of General Services ("OGS") as an "assistant building construction engineer" from November 4, 1993 to the present.  (Am. Compl. ¶ 2 (Dkt. No. 10).)  Plaintiff's role covered two avenues of state construction work:  (1) "Capital Projects," which involve work "designed and bid by OGS in Albany," and then "handed down to the site of construction . . . where Plaintiff was, and is, employed," (*id.* ¶ 9), and (2) "Emergency Projects," such as "flooding, fire, a broken water main, or a short circuit in an electrical transformer," (*id.*).  With respect to the latter work, "Plaintiff would receive a call from Albany, or from a local supervisor, and . . . travel to the problem location."  (*Id.* ¶ 10.)  He would then "determine the scope of the repair, formulate a contractor response, and solicit contractors to bid. Once a low bidder was determined, Plaintiff would direct the contractor to do the work until the emergency condition no longer existed."  (*Id.*)

Defendants are various supervisors, directors, and officers at OGS.  Specifically, Jonathan P. Morgan ("Morgan") is, and at all relevant times was, "Area Supervisor"; Robert E. Levin ("Levin") is, and at all relevant times was, "Regional Supervisor"; Robert K. Palmer ("Palmer") is, and at all relevant times was, "Director of the Division of Construction"; James Barron ("Barron") is, and at all relevant times was, "Director of Labor Relations"; Karim Adeen-

---

[1] Plaintiff attached a number of exhibits to his original Complaint, which he did not physically attach to his Amended Complaint.  On January 5, 2015, the Court granted Plaintiff's request that the Amended Complaint incorporate the exhibits from the original Complaint, (Dkt. No. 16), thus it is appropriate for the Court to consider such exhibits.

Hasan ("Adeen-Hasan") is, and at all relevant times was, "Chief Diversity Officer"; and Daniel

J. Cunningham ("Cunningham") is, and at all relevant times was, "Director of Human Resources

Management." (*Id.* ¶¶ 3–8.)

### 2. Plaintiff's Employment at OGS

#### a. Project Disagreements

Plaintiff's Amended Complaint highlights two specific projects that he worked on for

OGS. First, around September 6, 2011, Plaintiff received a call about an emergency project

comprised of repairs to the "State Emergency Management Office Building/Bunker" in the

aftermath of Hurricane Irene. (*Id.* ¶ 11.) The low bidder for the job was Eastern Environmental,

which, at Plaintiff's direction, solicited bids from various water remediation contractors in order

to get wet vacuums and air dehumidifiers on site. (*Id.*) ServPro was the only water remediation

contractor available at the time, and Plaintiff directed that ServPro not spend more than $15,000

on the water remediation. (*Id.*) Recognizing that the project required a mold remediation as

well, Plaintiff solicited bids, but only ServPro could do the work, and so Plaintiff requested a

waiver of the three bid rule for the mold remediation. (*Id.*) Plaintiff "was immediately berated

by . . . Morgan and then . . . Levin for allowing the water remediation contractor to go over the

$15,000 threshold for competitive bids," even though ServPro had not gone over the limit. (*Id.*

¶ 12.) Plaintiff remained in constant contact with the "Facility's Office Manager" to ensure

ServPro did not go beyond the $15,000 limit, but was "directed to pull the contractor 100% off

the project." (*Id.* ¶ 13.) Plaintiff informed Morgan and Levin that he had not reached the

$15,000 limit "and that [he] was buying time to roll right over into the mold remediation—which

was important for the good of the client." (*Id.*)

Despite his objections, Plaintiff was again told to pull the water remediation completely off the project. (*Id.* ¶ 14.) Plaintiff informed Morgan and Levin that progress was being made with the building's air quality and that he "could not pull the equipment out until [he] had an authorized contractor for the mold portion of the remediation." (*Id.*) Doing otherwise would be "acting against the client's best interest," because removing the dehumidifiers and air scrubbers at that time "would have allowed an explosion of caustic mold and set [the] [c]lient's return to their building back many weeks." (*Id.*) Plaintiff was "counselled" on September 12, 2011 "for not immediately abandoning the client and pulling the equipment off completely." (*Id.* ¶ 15.)

Plaintiff then "asked [ServPro] to go to the $15,000 limit by leaving [its] equipment running through the upcoming weekend" and directed ServPro "to remove [its] air changing and dehumidification equipment while trying to obtain a waiver to allow them to" finish the job. (*Id.*) Plaintiff received the requisite three-bid waiver and asked ServPro to get its equipment back on site, but was informed by ServPro that it did not have the manpower to remobilize back to the project site. (*Id.*) Morgan directed Plaintiff to "get the equipment and contractor back immediately," but Plaintiff informed him that ServPro was otherwise engaged and could not return. (*Id.*) Morgan then wrote up Plaintiff for "a second counselling memo" on September 15, 2011 for failing to get ServPro back immediately. (*Id.* ¶ 16.) Morgan "then informed the facility representatives that [Plaintiff] had totally botched the Emergency Project's response and execution." (*Id.*)

Plaintiff also describes an assignment that "involved removing a roof, and providing a new roof, at DOT Region 8 Maintenance Headquarters." (*Id.* ¶ 17.) Plaintiff "had seen the owner of th[e] property lowering and jumping down from a lower roof," and he "had also seen the owner and his crew working without hard hats when crane work was going on overhead."

4

(*Id.*)  He also noticed that "the contractor was failing to properly seal the seams between the old and new roof."  (*Id.*)  Accordingly, Plaintiff told Morgan that he "needed a term roof inspector contract in order to deal with this rule breaking contractor."  (*Id.*)  Morgan asked Plaintiff why he could not handle it on his own, and Plaintiff explained that he was not a roof specialist and also that the contractor was "trying to manipulate" him.  (*Id.* ¶ 18.)  Morgan then informed the Facility Manager that Plaintiff was "not a qualified Engineer-In-Charge," thus "denigrating" Plaintiff to the Facility Manager.  (*Id.*)  Plaintiff was removed from the project, and yet, within a week, his replacement had a dedicated roof inspector to manage the violations of the roofing contractor, just as Plaintiff had previously requested.  (*Id.* ¶¶ 18–19.)

<u>b.  False Accusations, Threats, and Harassment Allegations</u>

Plaintiff's Amended Complaint alleges a plethora of individual instances of Defendants—most frequently Morgan or Levin—harassing Plaintiff, particularly between December 27, 2010 and March 25, 2011 and again between October 6, 2011 and December 7, 2011.  (*See generally id.* ¶¶ 20–72.)  For example:

- Morgan frequently "made . . . false accusations that Plaintiff had been AWOL," including on December 27, 2010 and throughout the month of January 2011.  (*Id.* ¶¶ 20–21.)

- Morgan "verbally assault[ed] Plaintiff throughout the month of January 2011," including on or about January 27, 2011, when Morgan "verbally terrorize[d] Plaintiff," threatened Plaintiff with being AWOL for seeking medical attention without asking for use of leave, and said to him, "You don't have long now," and "I am going to break you," which led Plaintiff to leave the office due to cardiac difficulties.  (*Id.* ¶¶ 22–25, 27.)

- Morgan continued to "verbally terrorize" Plaintiff in early February 2011, and Plaintiff again had to leave the office due to cardiac difficulties, spending the night of February 2, 2011 in the emergency room.  (*Id.* ¶ 28.)

- On February 8, 2011, Morgan, with Levin's authority, falsely accused Plaintiff of "unspecified tardiness and unspecified absence without authorization."  (*Id.* ¶ 29.)

- On February 9, 2011, Morgan "requested that Albany Human Resources revoke Plaintiff's submission of his previous year's timesheets."  (*Id.* ¶ 31.)  He made the same request the

following week, which amounted to "falsely accus[ing] Plaintiff of misappropriating state time—a serious charge."  (*Id.* ¶ 36.)

- Also on February 9, 2011, Morgan falsely accused Plaintiff of forging Sloan Kettering forms that confirmed Plaintiff donated blood on certain days.  (*Id.* ¶ 32.)

- On February 15, 2011, Levin "requested that Albany Human Resources revoke Plaintiff's submission of six month and eleven month old timesheets."  (*Id.* ¶ 34.)

- On February 16, 2011, Morgan threatened to deny Plaintiff's request for time off to go to the doctor, (*id.* ¶ 35), and on February 22, 2011 and February 25, 2011, he denied such requests, (*id.* ¶¶ 40, 44).

- On February 17, 2011, Plaintiff requested Palmer "intercede and investigate the unhealthy and potentially life-threatening abuse" that Morgan and Levin "were continually inflicting on Plaintiff."  (*Id.* ¶ 39.)

- On February 23, 2011, Levin backdated Plaintiff's most recent Performance Evaluation, to allow Morgan to give Plaintiff a six-month review in May 2011.  (*Id.* ¶ 42.)

- On February 25, 2011, Morgan falsely accused Plaintiff of improper work procedures, verbally abused and yelled at Plaintiff, falsely accused him of being AWOL, and wrote him up for being AWOL.  (*Id.* ¶¶ 43, 45.)

- On or about March 3, 2011, Morgan "revoked Plaintiff's sworn . . . Leave and Accrual Tracking System . . . document."  (*Id.* ¶ 46.)

- On or about October 6, 2011, Morgan falsely accused Plaintiff of being AWOL the previous day, and supported the accusation by wrongfully adjusting times and dates.  Plaintiff disputed these times and dates with Morgan but "to no avail."  (*Id.* ¶¶ 65–66.)

- On or about October 18, 2011, Morgan attempted to provoke Plaintiff by stating to him upon entering the office, "Thanks for leaving so you don't hurt me."  Plaintiff sent an email to Palmer and Adeen-Hasan notifying them of the incident.  (*Id.* ¶¶ 67–68.)

- On or about December 5, 2011, Morgan falsely accused Plaintiff of being AWOL on October 6, 2011 and also on October 12, 2011.  (*Id.* ¶¶ 70–71.)  Levin "wrongfully backed . . . Morgan's false accusations."  (*Id.* ¶ 72.)[2]

_____

[2] Plaintiff alleges that, at some unspecified time, he was interrogated "by the NYS Governor's Office [o]f Labor Relations" concerning purported AWOLs on October 6, 2011 and October 12, 2011.  (Am. Compl. ¶ 75(e).)

<u>c.  Medical Information Allegations</u>

Plaintiff's Amended Complaint also contains a number of allegations related to Defendants' efforts to require Plaintiff to disclose certain medical information.  These allegations span the months of February 2011 and March 2011.

First, on or about February 9, 2011, Levin "tried to force Plaintiff to complete an improper and unnecessary form" before visiting his psychiatrist, whom Plaintiff had visited to deal with his difficulties at work.  (*Id.* ¶ 30.)  Levin "wrongfully demanded" Plaintiff have his doctor complete the form.  (*Id.*)  Just under a month later, on March 4, 2011, Morgan and Levin "issued a 'One Day Letter'" to Plaintiff.  (*Id.* ¶ 48.)  Such a letter "requires Plaintiff to publicly air medical issues with superiors" and required Plaintiff "to submit to [Levin] a physician's diagnosis of Plaintiff," and to obtain from his physician "a written description of the purposes for which he was seen."  (*Id.*)[3]  On March 9, 2011, Morgan bragged to a fellow employee that he "had gotten Plaintiff on a One Day Letter."  (*Id.* ¶ 49.)[4]  The following day, Levin "had his secretary scan and e-mail Plaintiff's doctor's information."  (*Id.* ¶ 50.)

Over the next few days, Plaintiff sought to challenge the One Day Letter.  He requested that Barron, in his role as Labor Relations Director, request justification or rescind the Letter, (*id.* ¶ 51), he requested that Levin and Morgan justify the Letter, (*id.* ¶ 52), and he informed Levin that he would be scheduling a meeting with Palmer, a higher-ranking supervisor, (*id.* ¶ 53). Levin tried to interfere with Plaintiff's ability to seek relief from Palmer, (*id.* ¶¶ 54, 56), and eventually, on or about March 16, 2011, Palmer, "after having phone conversations with Plaintiff, . . . did not respond to Plaintiff['s concerns]," (*id.* ¶ 55; *see also id.* ¶¶ 56, 62).

---

[3] Plaintiff alleges that "OGS Human Resources was satisfied with a note from the [d]octor stating that Plaintiff was seen on a specific day."  (Am. Compl. ¶ 48.)

[4] Plaintiff brought this to Palmer's attention on March 25, 2011.  (Am. Compl. ¶ 64.)

On March 14, 2011, Morgan and Levin "required Plaintiff to reveal personal medical information." (*Id.* ¶ 58.)[5] That same day, Plaintiff reached out to Barron again "for relief from exposing Plaintiff's sensitive medical information, including highly personal information relating to [his] ongoing . . . [m]edical and [psy]chological conditions." (*Id.* ¶ 59.) Barron informed Plaintiff he was still reviewing the justification for the One Day Letter and then "state[d] Plaintiff was required to 'provide medical documentation for absences ascribed to illness.'" (*Id.* ¶ 60.) On or about March 22, 2011, Plaintiff informed Levin that he would be sending "ADM 48s," which are "Physician's Certification[s] sensitive Medical Documentation," and "Levin's response was that Plaintiff was not being cooperative." (*Id.* ¶ 61.)[6]

### d. Internal Grievance Allegations

The Amended Complaint contains a number of references to various internal grievances and complaints filed by Plaintiff. Some documents relevant to those grievances are attached as exhibits. In sum, Plaintiff alleges that he filed the following: "Workers['] Compensation Claim, Request for Reasonable Accommodation, Workplace Violence Complaint, Hostile Work Environment, Taylor Law Request[,] Freedom [o]f Information Act requests of e-mails from all Defendants in regard to Plaintiff, and FOIA of Defendant . . . Adee[n]-Hasan's investigation into Hostile Work Environment Claim by Plaintiff." (*Id.* ¶ 74 (emphasis omitted).)

Plaintiff pleads these additional facts about certain filings:

---

[5] It is not clear to what medical information Plaintiff refers or whether this is related to the earlier One Day Letter.

[6] Ultimately, the Amended Complaint is ambiguous as to what medical information, if any, was ever *actually disclosed* by Plaintiff as a result of the One Day Letter. Plaintiff alludes to the fact that the Letter "required" Plaintiff to reveal certain information, but he also describes his efforts to challenge the Letter. The final allegation related to his medical information states that he "would be sending 'ADM 48s,'" (Am. Compl. ¶ 61), but does not allege whether he actually sent them.

- Workers' Compensation Claim:  Plaintiff filed the claim in February 2011 "to document the physical toll Defendants' actions were taking on him."  (*Id.* ¶ 33.)  Based on Plaintiff's supporting documentation, the claim was settled, and the State Insurance Fund agreed to pay Plaintiff a net payment of $2,215, as well as the costs of the medical bills for 20 visits by Plaintiff to his psychiatrist.  (*See id.* Ex. G.)

- Request for Reasonable Accommodation:  Plaintiff filed this request to Cunningham on or about February 23, 2011, and the request "provided in great detail the abuse by . . . Morgan."  (Am. Compl. ¶ 41.)  In an email attached as an exhibit, Plaintiff explained to Cunningham at the time that he had "a series of upcoming [d]octor appointments, all due . . . to the stressful work environment."  (*See id.* Ex. I.)

- Taylor Law Request:  On or about March 24, 2011, Plaintiff filed a request under the Taylor Law, "which allows union[s] to make certain demands of management, in order to learn the nature of . . . Morgan's complaints against Plaintiff," but Levin ignored the request.  (Am. Compl. ¶ 63.)

- Workplace Violence Complaint:  Plaintiff filed this complaint "after OGS finally made the policy available" in January 2012.  (*Id.* ¶ 73.)  The complaint itself is dated March 6, 2013, and states that Morgan "created a [h]ostile and [a]busive work [e]nvironment on a daily basis," which resulted in medical issues for Plaintiff.  (*See id.* Ex. K.)  On January 6, 2014, Plaintiff received a letter from the Assistant Director of Personnel for Division of Human Resources Management for OGS, which stated that Plaintiff's "claim of workplace violence had been substantiated."  (Am. Compl. ¶ 80; *see also id.* Ex. L.)[7]

- Hostile Work Environment Claim:  Plaintiff alleges that Adeen-Hasan "stonewalled the Hostile Work Environment investigation."  (Am. Compl. ¶ 75(d).)  According to Plaintiff's Workplace Violence Complaint, "[u]pper management was informed" of the hostile work environment but an "[i]nvestigation was conducted for Sexual/Racial/Religious Harrassment [sic], which was never alleged."  (*Id.* Ex. K.)

### e.  Notice of Discipline

A Notice of Discipline, dated September 23, 2012, was filed against Plaintiff, alleging

that he was AWOL on certain days and that he engaged in improper internet use.  (Am. Compl.

---

[7] In May 2014, Plaintiff noticed "on the bulletin board" that there were Notices of Violation and Orders to Comply issued by the New York State Department of Labor.  (Am. Compl. ¶ 81.)  The Notices listed "numerous 'serious' violations, including failing to examine records relating to workplace violence; failure to assess relevant policies and practices that may impact the risk of workplace violence; and failure to evaluate the workplace to determine the presence of factors placing employees at risk of workplace violence."  (*Id.*; *see also id.* Ex. M.) It is not clear whether these Notices were a result of Plaintiff's complaint, but he alleges that they "corroborate[] Plaintiff's claims."  (Am. Compl. ¶ 81.)

¶ 76.)  The Notice was filed "[11] months after the dates complained of," and thus "Plaintiff could not defend himself against the internet usage portion of the [N]otice because the OGS website had purportedly changed."  (*Id.*)[8]  Plaintiff also alleges that the Notice accused him of being AWOL "on different days than those about which he was earlier interrogated."  (*Id.*)  Plaintiff "fought" the Notice "through his Union Representative," (*id.* ¶ 77), but was eventually "docked 6 days pay by OGS for the charges levied in the Notice," (*id.* ¶ 78).  Plaintiff attaches to the Amended Complaint a letter from the OGS Labor Relations Representative which states that "Arbitrator Edward Battisti granted his Opinion and Award . . . to resolve the Notice of Discipline issued to you on September 21, 2012," and that Arbitrator Battisti found just cause to implement disciplinary action, which amounted to suspension without pay for a period of one week.  (*See id.* Ex. N.)[9]

B.  Procedural History

Plaintiff filed the initial Complaint on July 15, 2014.  (Dkt. No. 1.)  On December 2, 2014, Plaintiff filed his Amended Complaint.  (Dkt. No. 10.)  The Court held a Pre-Motion Conference on January 15, 2015, (*see* Conf. Tr. (Dkt. No. 18)), at which the Court adopted a briefing schedule for Defendants' Motion, (Dkt. No. 17).  On March 9, 2015, Defendants filed their Motion, (Dkt. Nos. 20–21), Plaintiff filed his opposition papers on April 24, 2015, (Dkt.

---

[8] In a possible reference to the Notice of Discipline, Plaintiff also alleges that the "OGS[] information technology department investigated Plaintiff's computer usage at the direction of . . . Levin, Palmer[,] and Cunningham" and that "[a] formal complaint was filed by OGS against Plaintiff at the behest of . . . Levin, Palmer[,] and Cunningham."  (Am. Compl. ¶ 75(f).)

[9] Although this letter refers to a Notice of Discipline issued "on September 21, 2012," (*see* Am. Compl. Ex. N), given Plaintiff's citation to the letter as evidence of the penalty imposed as a result of the Notice of Discipline he alleges was dated September 23, 2012, (*see* Am. Compl. ¶¶ 76, 82(a)), the Court assumes the two Notices of Discipline are one and the same.

No. 22), and Defendants filed their reply brief in further support of the Motion on May 22, 2015, (Dkt. No. 23).

## II.  Discussion

### A.  Standard of Review

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration, citation, and internal quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement."  *Id.* (internal quotation marks and alterations omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R.

Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) ("In addressing the sufficiency of a complaint we accept as true all factual allegations . . . ." (internal quotation marks omitted)); *Aegis Ins. Servs., Inc. v. 7 World Trade Co.*, 737 F.3d 166, 176 (2d Cir. 2013) ("In reviewing a dismissal pursuant to Rule 12(b)(6), we . . . accept all factual allegations in the complaint as true . . . ." (internal quotation marks and alterations omitted)).  Further, "[f]or the purpose of resolving [a] motion to dismiss, the [c]ourt . . . draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).  Additionally, "[i]n ruling on a 12(b)(6) motion, . . . a court may consider the complaint[,] . . . any written instrument attached to the complaint as an exhibit[,] or any statements or documents incorporated in it by reference," as well as "matters of which judicial notice may be taken, and documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Kalyanaram v. Am. Ass'n of Univ. Professors at N.Y. Inst. of Tech., Inc.*, 742 F.3d 42, 44 n.1 (2d Cir. 2014) (alterations and internal quotation marks omitted); *see also Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) ("In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which

judicial notice may be taken." (internal quotation marks omitted)); *Hendrix v. City of N.Y.*, No. 12-CV-5011, 2013 WL 6835168, at *2 (E.D.N.Y. Dec. 20, 2013) (same).

Lastly, because Plaintiff is proceeding pro se, the Court must construe his pleadings liberally and "interpret them to raise the strongest arguments that they suggest." *Maisonet v. Metro. Hosp. & Health Hosp. Corp.*, 640 F. Supp. 2d 345, 347 (S.D.N.Y. 2009) (internal quotation marks omitted); *see also Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (same). This admonition "applies with particular force when a plaintiff's civil rights are at issue." *Maisonet*, 640 F. Supp. 2d at 348; *see also McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004) (same). However, the liberal treatment afforded to pro se litigants does not excuse a pro se party "from compliance with relevant rules of procedural and substantive law." *Maisonet*, 640 F. Supp. 2d at 348 (internal quotation marks omitted).

B.  Analysis

    1.  First Amendment Retaliation Claim

Plaintiff alleges that Defendants violated his "right to free speech under the Constitution by retaliating after [he] filed numerous grievance reports and after Plaintiff acted in the best interest of clients." (Am. Compl. ¶ 92.) Defendants argue that Plaintiff has failed to state a First Amendment retaliation claim because he "has failed to allege that he engaged in a protected activity." (*See* Mem. of Law in Supp. of Defs.' Mot. To Dismiss ("Defs.' Mem.") 8 (Dkt. No. 21); *see also* Reply Mem. of Law in Supp. of Defs.' Mot. To Dismiss ("Defs.' Reply Mem.") 8 (Dkt. No. 23).) The Court agrees with Defendants.

        a.  Applicable Law

While the Second Circuit has "described the elements of a First Amendment retaliation claim in several ways, depending on the factual context," *Williams v. Town of Greenburgh*, 535

13

F.3d 71, 76 (2d Cir. 2008), it is nonetheless "established law in this Circuit that, 'regardless of the factual context, . . . a plaintiff alleging retaliation [must] establish [he engaged in] speech protected by the First Amendment,'" *Sousa v. Roque*, 578 F.3d 164, 169–70 (2d Cir. 2009) (quoting *Williams*, 535 F.3d at 76).  "To determine whether or not a plaintiff's speech is protected, a court must begin by asking 'whether the employee spoke as a citizen on a matter of public concern.'" *Id.* at 170 (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)); *see also Golodner v. Berliner*, 770 F.3d 196, 202 (2d Cir. 2014) ("The First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." (internal quotation marks omitted)).  "If the court determines that the plaintiff either did not speak as a citizen or did not speak on a matter of public concern, 'the employee has no First Amendment cause of action based on his or her employer's reaction to the speech.'" *Sousa*, 578 F.3d at 170 (quoting *Garcetti*, 547 U.S. at 418).

### b.  Application

As noted above, Plaintiff contends that his "right to free speech under the Constitution" was violated by Defendants when they "retaliat[ed] after Plaintiff filed numerous grievance reports and after Plaintiff acted in the best interest of clients."  (Am. Compl. ¶ 92.)  The Court will consider the two categories of speech in turn.

### i.  Grievances

The critical question with respect to Plaintiff's "numerous grievance reports," (*id.*), is whether those grievances  "address[] a matter of public concern or [are] merely 'related to personal grievances,' which is a question of law for the court to decide in light of the content, form, and context of [the] statement[s]," *Golodner*, 770 F.3d at 203 (quoting *Reuland v. Hynes*, 460 F.3d 409, 417 (2d Cir. 2006)).  As the Second Circuit has explained,

> [g]enerally speaking, a matter of public concern relates to any matter of political,
> social, or other concern to the community. In examining whether speech is on a
> matter of public concern, we consider the motive of the speaker, cognizant that
> speech on a purely private matter . . . does not pertain to a matter of public
> concern and, conversely, that an individual motivated by a personal grievance can
> simultaneously speak on a matter affecting the public at large.

*Id.* (alteration in original) (citations and internal quotation marks omitted); *see also Cecchini v.
Schenck*, No. 14-CV-1704, 2016 WL 777901, at *11 (D. Conn. Feb. 29, 2016) (same).

Importantly, "a 'generalized public interest in the fair or proper treatment of public employees is
not enough' to transform a personal grievance related to the conditions of one's employment into
a matter of public concern." *Golodner*, 770 F.3d at 204 (quoting *Ruotolo v. City of N.Y.*, 514
F.3d 184, 190 (2d Cir. 2008)); *see also Pedrosa v. City of N.Y.*, No. 13-CV-1890, 2014 WL
99997, at *12 (S.D.N.Y. Jan. 9, 2014) (same). "Speech that, at its heart, is limited to such
grievances does not implicate the First Amendment. Put simply, the 'First Amendment does not
protect all private ventings of disgruntled public employees.'" *Golodner*, 770 F.3d at 204
(quoting *Singer v. Ferro*, 711 F.3d 334, 340 (2d Cir. 2013)).

Plaintiff's filing of a "Worker[s'] Compensation Claim, Request for Reasonable
Accommodation, Workplace Violence Complaint, Hostile Work Environment, Taylor Law
Request[,] Freedom [o]f Information Act requests of e-mails from all Defendants in regard to
Plaintiff, and FOIA of . . . Adee[n]-Hasan's investigation into Hostile Work Environment Claim
by Plaintiff," (Am. Compl. ¶ 74 (emphasis omitted)), are "personal grievances related to the
conditions of one's employment" and do not "relate[] to any matter of political, social, or other
concern to the community," *Golodner*, 770 F.3d at 203–04; *see also Shein v. N.Y.C. Dep't of
Educ.*, No. 15-CV-4236, 2016 WL 676458, at *7 (S.D.N.Y. Feb. 18, 2016) (holding that the
plaintiff "did not speak as a citizen on a matter of public concern" when she wrote a letter "in her
private capacity to complain of her treatment in the workplace," and "[t]he letter only addressed

[the plaintiff's] personal issues with her employment"); *Quattrone v. Erie 2 Chautauqua-Cattaraugus Bd. of Coop. Educ. Servs.*, No. 08-CV-367, 2011 WL 4899991, at *13 (W.D.N.Y. Oct. 13, 2011) (granting summary judgment to the defendants on First Amendment retaliation claim where the "plaintiff's efforts were at all times clearly calculated to remedy grievances relating to her employment situation, not to draw attention to issues of interest to the community" (alteration and internal quotation marks omitted)), *aff'd*, 503 F. App'x 12 (2d Cir. 2012).[10]

The descriptions of these filings in the Amended Complaint confirm their *personal* nature. While motive is not dispositive, the grievances do not "also touch[] upon a matter of public concern, such as generalized police misconduct or unlawful discrimination." *Heusser v. Hale*, 777 F. Supp. 2d 366, 379 (D. Conn. 2011); *see also Miller v. N.Y.C. Dep't of Educ.*, 622 F. App'x 38, 39 (2d Cir. 2015) (summary order) (finding that the plaintiff's speech did not address a matter of public concern because it was "focused entirely on [the] defendants' treatment of the plaintiff alone" and because "the only victim of [the] defendants' alleged actions . . . [was] the plaintiff himself"). Specifically, Plaintiff filed (1) a workers' compensation claim "to document

_____

[10] In his opposition, Plaintiff argues that "[t]he rights to complain to public officials and to seek administrative and judicial relief from their actions are protected by the First Amendment." (Pl.'s Mem. of Law in Opp'n to Defs.' Mot. To Dismiss ("Pl.'s Opp'n") 15 (quoting *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 91 (2d Cir. 2002)) (Dkt. No. 22).) While it is true that "the right to petition government for redress of grievances [is] 'among the most precious of the liberties safeguarded by the Bill of Rights,'" *Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988) (quoting *United Mine Workers v. Ill. State Bar Ass'n*, 389 U.S. 217, 222 (1967)), to the extent that Plaintiff attempts to bring his retaliation claim as one arising under the First Amendment's Petition Clause as opposed to the Free Speech Clause, the claim would still be "subject to the same public concern test," *Singer*, 711 F.3d at 342; *see also Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 131 S. Ct. 2488, 2500–01 (2011) ("The framework used to govern Speech Clause claims by public employees . . . applie[s] to the Petition Clause . . . [and] [a]s under the Speech Clause, whether an employee's petition relates to a matter of public concern will depend on the content, form and context of the petition, as revealed by the whole record." (alteration and internal quotation marks omitted)).

the physical toll Defendants' actions were *taking on him*," (Am. Compl. ¶ 33 (emphasis added)),

(2) a request for reasonable accommodation that "provided in great detail the abuse [of Plaintiff]

by . . . Morgan," (*id.* ¶ 41), (3) a workplace violence complaint that stated Morgan "created a

[h]ostile and [a]busive work [e]nvironment" and that "Gene A. Lefebvre" suffered "[s]tress and

[f]ear" as a result, (*Id.* Ex. K), (4) a Taylor Law request "in order to learn the nature

of . . . Morgan's complaints *against Plaintiff*," (Am. Compl. ¶ 63 (emphasis added)), and (5)

Freedom of Information Act requests of Defendants' emails "*in regard to Plaintiff*," (*id.* ¶ 74

(emphasis added)).  While Plaintiff's Amended Complaint does not expressly elaborate as to the

content of his filing of a "Hostile Work Environment," the context of the Amended Complaint

implies that any such filing related to Defendants' treatment of Plaintiff individually.  (*See, e.g.*,

*id.* ¶ 43 ("Morgan . . . continued with his verbal abuse . . . [and] Plaintiff left the . . . [o]ffice so as

to not escalate the hostile work environment."); *id.* ¶ 45 ("Morgan further created a hostile work

environment *for Plaintiff* by yelling and physical positioning." (emphasis added)).)  Relatedly,

therefore, Plaintiff's last alleged "filing," a "FOIA of . . . Adee[n]-Hasan's investigation into

Hostile Work Environment Claim by Plaintiff," also addresses his treatment alone.  Because

these filings, "at [their] heart, [are] limited to" "personal grievance[s] related to the conditions of

[Plaintiff's] employment," the filings "do[] not implicate the First Amendment" and cannot form

the basis of a First Amendment retaliation claim.  *Golodner*, 770 F.3d at 204.[11]

---

[11] Plaintiff argues that "it is a concern to the community when a public government office, such as OGS, retaliates against an employee for filing a workers['] compensation claim." (Pl.'s Opp'n 15.)  Even if this is true, however, it mischaracterizes the speech for which Plaintiff claims he was retaliated against.  It is the *filing of the workers' compensation claim* itself that allegedly led to the retaliatory actions, and the issues raised in that claim merely focus on personal grievances related to the conditions of Plaintiff's employment.  *Cf. Golodner*, 770 F.3d at 202–03 (explaining that courts determining whether speech is on a matter of public concern can only consider the "speech that had been uttered at the time of the government's action" (internal quotation marks omitted)).

<u>ii.  Acting in the Best Interests of Clients</u>

While Plaintiff argues that he was retaliated against for "act[ing] in the best interests of clients," (Am. Compl. ¶ 92), it is not entirely clear as to the particular speech in which he is alleging he engaged and for which he was retaliated against, (*see, e.g.*, Pl.'s Mem. of Law in Opp'n to Defs.' Mot. To Dismiss ("Pl.'s Opp'n") 15 ("It is a concern to the community how OGS interacts with its clients and whether it treats them fairly.  [P]aragraphs 11–19 [of the Amended Complaint] detail[] how . . . Morgan violated Plaintiff's right to free speech by informing the facility representatives that [Plaintiff] had totally botched the Emergency Project's response and execution.") (Dkt. No. 22)).  The cited portions of the Amended Complaint refer to conversations and disagreements between Plaintiff and Morgan and Levin over how two work projects should be completed.  (*See* Am. Compl. ¶¶ 11–19.)

First, with respect to a project in the aftermath of Hurricane Irene, Plaintiff alleges that he was "directed to pull the contractor 100% off the project" and that, in response, he "informed" Morgan and Levin "that [he] had not reached the $15,000 limit, and that [he] was buying time to roll right over into the mold remediation—which was important for the good of the client."  (*Id.* ¶ 13.)  Later, Plaintiff was "again told to pull the water remediation completely . . . off the project" and once again "informed . . . Morgan and Levin that . . . [he] could not pull the equipment out until [he] had an authorized contractor for the mold portion of the remediation without acting against the client's best interest."  (*Id.* ¶ 14.)  Plaintiff alleges that he was "counselled" for not doing as he was asked.  (*Id.* ¶ 15.)  He was later directed by Morgan to "get the equipment and contractor back immediately," but he informed Morgan that "the contractor was otherwise engaged and could not do so."  (*Id.*)  Plaintiff again was allegedly written up for

failing to get the contractor back immediately, and Morgan then informed the facility

representatives that Plaintiff had "totally botched the [project's] response and execution." (*Id.*)

Second, on an assignment involving the removal of a roof, Morgan allegedly informed

the Facility Manager that Plaintiff was not a qualified Engineer-In-Charge and "denigrat[ed]"

Plaintiff to the Facility Manager after Plaintiff told Morgan that he needed a term roof inspector

to deal with possible safety infractions occurring on site. (*Id.* ¶¶ 17–18.)

Accordingly, it appears that Plaintiff contends that his protected speech consisted of his

efforts to advocate for certain methods to complete the two work projects. While Plaintiff argues

that this speech involved a matter of public concern because "[i]t is a concern to the community

how OGS interacts with its clients and whether it treats them fairly," (Pl.'s Opp'n 15), the Court

need not reach the public concern question because Plaintiff "did not speak as a citizen," *Sousa*,

578 F.3d at 170 ("If the court determines that the plaintiff either did not speak as a citizen *or* did

not speak on a matter of public concern, the employee has no First Amendment cause of action

based on his or her employer's reaction to the speech." (emphasis added) (internal quotation

marks omitted)); *see also Weintraub v. Bd. of Educ. of City Sch. Dist.*, 593 F.3d 196, 201 (2d Cir.

2010) (finding that the plaintiff did not speak as a citizen for purposes of the First Amendment

and thus "there [was] no cause for [the court] to address whether [the speech] related to a matter

of public concern" (internal quotation marks omitted)).

As with the public concern analysis above, "[w]hether the employee spoke solely as an

employee and not as a citizen is also largely a question of law for the court." *Jackler v. Byrne*,

658 F.3d 225, 237 (2d Cir. 2011). The Supreme Court "has defined speech made 'pursuant to' a

public employee's job duties," and thus speech not protected by the First Amendment, "as

'speech that owes its existence to a public employee's professional responsibilities.'"

*Weintraub*, 593 F.3d at 201 (quoting *Garcetti*, 547 U.S. at 421).  "[S]peech can be pursuant to a public employee's official job duties even though it is not required by, or included in, the employee's job description, or in response to a request by the employer."  *Id.* at 203 (internal quotation marks omitted).[12]  If the speech was a "means to fulfill, and undertaken in the course of performing, [a plaintiff's] primary employment responsibility," the plaintiff speaks as an employee and not a citizen.  *Id.* (citations and internal quotation marks omitted); *see also Dillon v. Suffolk Cty. Dep't of Health Servs.*, 917 F. Supp. 2d 196, 207 (E.D.N.Y. 2013) (same).

"The inquiry into whether a public employee is speaking pursuant to [his or] her official duties is not susceptible to a bright line rule," and requires that a court "examine the nature of the plaintiff's job responsibilities, the nature of the speech, and the relationship between the two." *Ross v. Breslin*, 693 F.3d 300, 306 (2d Cir. 2012); *see also Pitton v. N.Y.C. Dep't of Educ.*, — F. Supp. 3d —, 2015 WL 7776908, at *7 (E.D.N.Y. Dec. 2, 2015) (same).[13]  Plaintiff's Amended Complaint helpfully details his responsibilities as an OGS employee.  In relevant part, he alleges that he would "travel to the . . . location" of an emergency project and, once there, "would determine the scope of the repair, formulate a contractor response, and solicit contractors to bid." (Am. Compl. ¶ 10.)  And once a low bidder was determined, "Plaintiff would direct the

---

[12] In a post-*Garcetti* case, *Lane v. Franks*, 134 S. Ct. 2369 (2014), the Supreme Court held that a public employee's speech consisting of sworn testimony, compelled by subpoena, was speech as a citizen—and thus protected by the First Amendment—because it was outside the "scope of [the employee's] ordinary job responsibilities." *Id.* at 2378.  Some courts have noted that, while *Garcetti*'s 'pursuant to official duties' standard remains good law," the *Lane* Court's repeated use of the term "ordinary job responsibilities" may "sharpen[] the inquiry and arguably 'signal[s] a narrowing of the realm of employee speech left unprotected by *Garcetti*.'"  *Hagan v. City of N.Y.*, 39 F. Supp. 3d 481, 510 (S.D.N.Y. 2014) (second alteration in original) (quoting *Mpoy v. Rhee*, 758 F.3d 285, 292–95 (D.C. Cir. 2014)).  This distinction does not affect the analysis here, because, as discussed below, Plaintiff's speech was related to the heart of his job responsibilities, as he himself defined them in his Amended Complaint.

[13] "Other contextual factors, such as whether the complaint was also conveyed to the public, may properly influence a court's decision."  *Ross*, 693 F.3d at 306.

contractor to do the work until the emergency condition no longer existed."  (*Id.*)  Considering

the "relationship between" these responsibilities and "the nature of [Plaintiff's] speech," *see*

*Ross*, 693 F.3d at 306, it is clear that the conversations with Defendants that form the basis of his

claims are directly related to his ordinary job responsibilities.  As detailed above, the

disagreements address Plaintiff's views as to how the projects should be carried out as well as his

interactions with various contractors.  (*See* Am. Compl. ¶¶ 12–15.)  Additionally, Plaintiff's

efforts to solicit a "term roof inspector contract in order to deal with th[e] rule breaking

contractor," (*id.* ¶ 17), directly fall under his responsibility to supervise and direct the contractor

that was hired to complete the project, (*id.* ¶¶ 9, 10).[14]

---

[14] Moreover, the Second Circuit has factored into its First Amendment analysis whether the speech was in a "form or channel of discourse available to non-employee citizens, as would be a letter to the editor or a complaint to an elected representative or inspector general." *Weintraub*, 593 F.3d at 204.  As the Second Circuit has put it recently, courts "ask two questions to determine whether a public employee speaks as a citizen:  (A) did the speech fall outside the employee's 'official responsibilities,' and (B) does a civilian analogue exist?"  *Matthews v. City of N.Y.*, 779 F.3d 167, 173 (2d Cir. 2015); *see also Dillon*, 917 F. Supp. 2d at 207 (noting that, "in the wake of *Weintraub*, many courts inside and outside this [C]ircuit have looked to the channels through which the speech was made as pertinent to the analysis," and collecting cases).  "Speech has a 'relevant civilian analogue' if it is made through 'channels available to citizens generally.'"  *Matthews*, 779 F.3d at 175 (quoting *Jackler*, 658 F.3d at 238).

Here, Plaintiff's speech was not made in some publicly available forum like a newspaper or a complaint to an elected representative, but was made through internal channels, in the form of disagreements with immediate supervisors.  "[C]ourts have held that because an instance of speech was made through internal channels, it was speech without a relevant civilian analogue." *Taylor v. N.Y.C. Dep't of Educ.*, No. 11-CV-7833, 2012 WL 3890599, at *4 (S.D.N.Y. Sept. 6, 2012) (collecting cases); *cf. Carter v. Inc. Vill. of Ocean Beach*, 693 F. Supp. 2d 203, 211 (E.D.N.Y. Feb. 19, 2010) ("If[,] however[,] a public employee takes his job concerns to persons outside the work place in addition to raising them up the chain of command at his workplace, then those external communications are ordinarily not as an employee, but as a citizen." (quoting *Davis v. McKinney*, 518 F.3d 304, 313 (5th Cir. 2008))), *aff'd*, 415 F. App'x 290 (2d Cir. 2011). While the Second Circuit has noted that there can be instances where employee speech delivered internally within the speaker's place of employment may still have a civilian analogue, such as where the recipients of that speech also "regularly heard civilian complaints," *Matthews*, 779 F.3d at 176, such is not the case here.  Plaintiff does not allege that Morgan or Levin regularly "met with members of the community," *id.*, or otherwise spoke with citizens about OGS's construction practices.

Accordingly, Plaintiff's comments regarding what was "in the best interests of the client" amounted to speech as an employee, not a citizen, and thus cannot serve as the basis of a First Amendment retaliation claim. Because Plaintiff has not pleaded that he engaged in any "speech protected by the First Amendment," *see Sousa*, 578 F.3d at 169–70, his First Amendment retaliation claim is dismissed.

### 2.  Procedural Due Process Claim

Plaintiff alleges that Defendants "deprived . . . Plaintiff of his right to due process" based on various acts described in the Amended Complaint.  (*See* Am. Compl. ¶¶ 84–86.)  His opposition briefing focuses the claim on the Notice of Discipline filed against Plaintiff on September 23, 2012.  (*See* Pl.'s Opp'n 13–14.)  Plaintiff alleges that the Notice was filed on September 23, 2012, "alleging that he was AWOL on different days than those about which he was earlier interrogated, as well as alleging improper internet usage."  (Am. Compl. ¶ 76.)[15] This Notice was filed "[11] months after the dates complained of," and thus "Plaintiff could not defend himself against the internet usage portion of the [N]otice because the OSG website had purportedly changed."  (*Id.*)  Plaintiff further alleges that he "fought the Notice of Discipline through his Union Representative" and that he was "docked 6 days pay by OGS for the charges levied in the Notice of Discipline."  (*Id.* ¶¶ 77–78.)  Additionally, Plaintiff attaches to the Amended Complaint a letter from the OGS Labor Relations Representative, which indicates that an arbitrator issued an opinion resolving the Notice of Discipline, finding "just cause to implement disciplinary action and found [Plaintiff] guilty of all disciplinary specifications" charged against Plaintiff.  (*Id.* Ex. N.)  The letter states that the penalty would be "suspension without pay for a period of one (1) week."  (*Id.*)

---

[15] Plaintiff does not allege who was actually responsible for the issuance of the Notice of Discipline.

Defendants argue that the due process claim must be dismissed because the Amended Complaint contains "no facts alleging what due process was due, how [Plaintiff] was denied due process, or even who denied him due process." (Defs.' Mem. 5–6; *see also* Defs.' Reply Mem. 5.) The Court agrees that, as currently pled, the Amended Complaint does not state a claim for a procedural due process violation. The claim will be dismissed without prejudice, and Plaintiff will be provided an opportunity to cure the deficiencies.

In order "[t]o plead a violation of procedural due process, . . . a plaintiff must first identify a property right, second show that the government has deprived him of that right, and third show that the deprivation was effected without due process." *J.S. v. T'Kach*, 714 F.3d 99, 105 (2d Cir. 2013) (alterations, emphasis, and internal quotation marks omitted); *see also Chrebet v. Cty. of Nassau*, 24 F. Supp. 3d 236, 244 (E.D.N.Y. 2014) (same), *aff'd*, 606 F. App'x 15 (2d Cir. 2015). The Court will consider both whether Plaintiff has pled the existence of a property right and whether he has pled the deprivation of such a right without due process.

### a. Property Right

The Second Circuit has explained that, for a procedural due process claim, "[t]he threshold issue is always whether the plaintiff has a property . . . interest protected by the Constitution." *Narumanchi v. Bd. of Trs.*, 850 F.2d 70, 72 (2d Cir. 1988). "Such property interests cannot be found on the face of the Constitution, but rather 'are created, and their dimensions are defined by, existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits.'" *Looney v. Black*, 702 F.3d 701, 706 (2d Cir. 2012) (alterations omitted) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). Thus, "[w]hen determining whether a plaintiff has a claim of entitlement, [courts] focus on the applicable statute, contract[,] or regulation that purports to

establish [it]." *Brown v. New York*, 975 F. Supp. 2d 209, 242 (N.D.N.Y. 2013) (quoting *Martz v. Inc. Vill. of Valley Stream*, 22 F.3d 26, 30 (2d Cir. 1994)).

"There is no doubt that government employees covered by laws and/or agreements prohibiting discharge without cause possess a [c]onstitutionally protected property right in continued employment," and "[i]t is also clear that procedural due process protections apply to acts that fall short of termination, such as suspension without pay." *Barnes v. Pilgrim Psychiatric Ctr.*, 860 F. Supp. 2d 194, 203 (E.D.N.Y. 2012); *see also O'Connor v. Pierson*, 426 F.3d 187, 197 (2d Cir. 2005) ("Although the Supreme Court has not decided whether procedural due process protections extend to employee discipline short of termination, we have done so in the case of a tenured state employee's suspension without pay." (citation omitted)).[16]  But Plaintiff's Amended Complaint is devoid of any reference to a state law, contract, or collective bargaining agreement that prohibits his discharge, or the imposition of other discipline, without cause, which would create a property right in his continued employment and may entitle him to due process protections before a suspension without pay.  *See Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 313–14 (2d Cir. 2002) (examining New York law and the relevant collective bargaining agreement to determine whether the plaintiff possessed a property interest in his employment position); *see also Airday v. City of N.Y.*, — F. Supp. 3d —, 2015 WL 5472945, at *6 (S.D.N.Y. Sept. 17, 2015) (dismissing procedural due process claim challenging suspension without pay where "the [c]omplaint [did] not reference a regulation, policy, agreement[,] or law

---

[16] Plaintiff's Amended Complaint alleges that he was "docked 6 days pay" as a result of the Notice of Discipline, (Am. Compl. ¶ 78), but the letter he attaches to his Amended Complaint to substantiate that loss refers to a "suspension without pay for a period of one (1) week," (*id.* Ex. N).  The Court assumes Plaintiff's reference to being docked 6 days pay is synonymous with a week-long suspension without pay.  The difference, while important to Plaintiff, is immaterial for purposes of this discussion.

that would entitle [the plaintiff] to a hearing prior to the [d]efendants' decision to pursue

suspension proceedings").

The Court recognizes that N.Y. Civil Service Law § 75, which provides that covered

employees "shall not be removed or otherwise subjected to any disciplinary penalty provided in

this section except for incompetency or misconduct shown after a hearing," has been found to

"give[] covered employees a property interest in their employment, so that they may not be

terminated without notice and hearing." *O'Neill v. City of Auburn*, 23 F.3d 685, 689 (2d Cir.

1994) (internal quotation marks omitted); *see also Holmes v. Gaynor*, 313 F. Supp. 2d 345, 357

(S.D.N.Y. 2004) (same).  One of the other "disciplinary penalt[ies] provided in [§ 75]," N.Y.

Civ. Serv. Law § 75(1), is a "suspension without pay for a period not exceeding two months," *id.*

§ 75(3), and so it follows that a property interest would be implicated if a covered employee is

improperly suspended without pay, *cf. Sanni v. N.Y. State Office of Mental Health*, No. 96-CV-

5720, 2000 WL 194681, at *10 (E.D.N.Y. Feb. 15, 2000) (noting that "[t]he Second Circuit has

held that New York state employees covered by [§ 75] have a property interest in their

employment . . . and, by logical extension, covered employees have a property interest in their

civil service grade," because "demotion in grade and title" is a punishment listed in §75(3)).

Covered employees include, in pertinent part, persons "holding a position by permanent

appointment in the competitive class of the classified civil service," and employees "holding a

position in the non-competitive class . . . who since [their] last entry ha[ve] completed at least

five years of continuous service in the non-competitive class."  N.Y. Civ. Serv. Law § 75.  But

Plaintiff's Amended Complaint does not specifically allege, for example, whether he is either a

competitive or non-competitive employee or whether he holds his position "by permanent

appointment"; indeed, he does not allege that he is a civil service employee at all and does not

even mention the civil service laws.  Plaintiff has only alleged that he "worked for [OGS] as [an] assistant building construction engineer from November 4, 1993 to the present."  (Am. Compl. ¶ 2.)  It may be that Plaintiff therefore intends to plead that he is a competitive permanent appointee under § 75, but he has not done so at this point.  As such, he has not yet sufficiently alleged the basis of his property interest in his employment.  *See Stresing v. Agostinoni*, No. 11-CV-967, 2012 WL 2405240, at *3 (W.D.N.Y. June 25, 2012) (dismissing procedural due process claim where the plaintiff's complaint only "allege[d] that he 'was guaranteed continued employment absent "just cause" for discharge in accordance with N.Y. Civ. Serv. L. § 75,'" but did not include "any factual allegations establishing that he falls within the protections of [§ 75]"); *cf. Dwyer v. Regan*, 777 F.2d 825, 830 (2d Cir. 1985) (finding that the plaintiff "alleged sufficient facts to show that he had a [protected] property interest," where he "alleged that he held his position by 'permanent appointment' and that that position was 'in the competitive class of the New York State civil service'").[17]

_____

[17] New York's Civil Service Law classifies employees into four classes:  (1) the exempt class; (2) the non-competitive class; (3) the labor class; and (4) the competitive class.  *See* N.Y. Civ. Serv. Law § 40.  The "competitive class" is defined by statute as all positions "except such positions as are in the exempt class, the non-competitive class[,] or the labor class."  *Id.* § 44.  New York Civil Service Regulations contain appendices listing positions falling under the exempt, non-competitive, and labor classes, and the position of "Assistant Building Construction Engineer" does not appear in any appendix.  *See* 4 N.Y.C.R.R. App'x 1–3.  Additionally, on the New York State Department of Civil Service website, of which this Court can take judicial notice, *see DeMarco v. Ben Krupinski Gen. Contractor, Inc.*, No. 12-CV-573, 2014 WL 3696020, at *5 n.4 (E.D.N.Y. July 22, 2014) ("A court may take judicial notice of a website." (internal quotation marks omitted)); *see also United States v. Akinrosotu*, 637 F.3d 165, 168 (2d Cir. 2011) (taking judicial notice of an inmate's expected release date on "the official website for the Bureau of Prisons"); *Elliott v. Nestle Waters N. Am. Inc.*, No. 13-CV-6331, 2015 WL 1611316, at *6 (S.D.N.Y. Mar. 3, 2015) (taking judicial notice of New Jersey Department of Labor and Workforce Development website's Frequently Asked Questions), *adopted as modified by* 2015 WL 1611333 (S.D.N.Y. Apr. 10, 2015), the position of "Assistant Building Construction Engineer" is listed as a "competitive" job.  *See* New York State Department of Civil Service, *Title and Salary Plan*, https://www.cs.ny.gov/tsplan/tsp.html (last visited Mar. 28, 2016).  Thus, the Court suspects Plaintiff will be able to adequately allege that his position is covered by N.Y.

<u>b.  Deprivation of Property Without Due Process</u>

Even assuming that Plaintiff had adequately pled that he possessed a property interest in his continued employment and thus he could not be suspended without pay in the absence of constitutionally adequate due process, his claim would still fail because he has not sufficiently alleged that he was denied due process.

"[W]hether the government deprived the plaintiff of [an] interest without due process," is an inquiry that "asks what process was due to the plaintiff, and inquires whether that constitutional minimum was provided in the case under review." *Narumanchi*, 850 F.2d at 72 (citing *Mathews v. Eldridge*, 424 U.S. 319 (1976)).  As a general proposition, in conducting this inquiry, the Second Circuit has held that "[a]n employee who has a property interest in his employment 'is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story,' before he is subjected to the loss of employment."  *Munafo v. Metro. Transp. Auth.*, 285 F.3d 201, 212 (2d Cir. 2002) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985)); *see also Amato v. Hartnett*, 936 F. Supp. 2d 416, 437 (S.D.N.Y. 2013) (same).  "[P]rocedural due process is satisfied if the government provides notice and a limited opportunity to be heard prior to termination, so long as a full adversarial hearing is provided afterwards."  *Munafo*, 285 F.3d at

---

Civ. Serv. Law § 75(1) so long as he held his position "by 'permanent appointment.'"  N.Y. Civ. Serv. Law § 75(1)(a).  Even so, it bears noting that § 75 rights "may be supplemented, modified[,] or replaced by agreements negotiated between the state and an employee organization," N.Y. Civ. Serv. Law § 76(4), and so "[§] 75 rights can be modified or replaced by the terms of a collective bargaining agreement," *Barnes*, 860 F. Supp. 2d at 198 (citing *Ciambriello*, 292 F.3d at 314).  While there are no direct allegations in the Amended Complaint regarding a collective bargaining agreement, Plaintiff does allude to "f[i]ght[ing] the Notice of Discipline through his Union Representative," implying the application of such an agreement.  (Am. Compl. ¶ 77.)  If Plaintiff chooses to file a Second Amended Complaint, he should include allegations that address the source of his alleged property interest in his employment—be it New York's Civil Service Law, a collective bargaining agreement, or something else.

212 (quoting *Locurto v. Safir*, 264 F.3d 154, 171 (2d Cir. 2001)); *see also Amato*, 936 F. Supp. 2d at 437 (same).

Here, Plaintiff fails to allege what process he was due before being suspended for a week without pay, how he was denied such process, and who denied him process. *See Hoy v. Inc. Vill. of Bayville*, 765 F. Supp. 2d 158, 175 (E.D.N.Y. 2011) (dismissing procedural due process claim where the "plaintiff's complaint d[id] not contain any facts concerning the process alleged due or how that process was denied"). Indeed, Plaintiff's allegations addressing the Notice of Discipline are that it was issued against Plaintiff alleging "different days" that he was AWOL than those "about which he was earlier interrogated," and that he "could not defend himself against the internet usage portion of the [N]otice because the OGS website had purportedly changed." (Am. Compl. ¶ 76.) With respect to the former point, the Notice of Discipline itself did not inflict the disciplinary punishment on him, but rather only apprised him of the charges he was facing. (*See id.* Ex. N (noting that an arbitrator had granted an "Opinion and Award" resolving the Notice issued in September 2012 which resulted in a penalty of suspension without pay for one week).) Thus, Plaintiff's issue with the differences between earlier interrogations and the eventual Notice essentially claims that he should have been provided earlier notice of the charges against him. As to his allegation that the "OGS website had purportedly changed," Plaintiff does not explain how this somehow prevented him from "present[ing] his side of the story," *Loudermill*, 470 U.S. at 546, prior to the imposition of his suspension, *cf. Newman v. Burgin*, 930 F.2d 955, 961 (1st Cir. 1991) ("The Constitution does not require every procedural protection that might help; it simply requires that a private person have a basically fair opportunity to convince the decision maker, by presenting proofs and arguments and evidence and replies to the arguments of others." (emphasis omitted)).

Additionally, as discussed above, Plaintiff attaches a letter from OGS's Labor Relations Representative that states that Plaintiff was not actually disciplined until after a hearing overseen by an arbitrator.  (*See* Am. Compl. Ex. N; *see also* Am. Compl. ¶ 77 (alleging that Plaintiff "fought the Notice of Discipline through his Union Representative").)  Thus, as the claim is currently alleged, Plaintiff was provided "written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story," *Loudermill*, 470 U.S. at 546, all that is constitutionally required, *see Locurto*, 264 F.3d at 173 ("Although due process guarantees notice and a hearing prior to the termination of a tenured public employee, the requisite hearing is a minimal one.").[18]  At this point, Plaintiff appears to merely disagree with the decision of the arbitrator, but "the Constitution protects only the process—not the result." *Harvey v. Inc. Vill. of Hempstead*, 879 F. Supp. 2d 277, 280 (E.D.N.Y. 2012).  Accordingly, Plaintiff's procedural due process claim is dismissed.[19]  However, the claim

_____

[18] Moreover, *Loudermill* addressed a situation where a public employee had been terminated, but, here, Plaintiff was only suspended without pay for one week, a much less substantial "private interest."  *Cf. Mathews*, 424 U.S. at 335 (explaining that how much process is due depends on a balance of a number of factors, including "the private interest that will be affected by the official action").

[19] In his opposition brief, Plaintiff claims that "Defendants also violated Plaintiff's right to liberty (as well as due process) by depriving him of a protected liberty interest; namely, ruining Plaintiff's good name at work."  (Pl.'s Opp'n 14 n.1.)  Based on this broad allegation, Plaintiff attempts to state a "stigma plus" claim, which requires that he show "(1) the utterance of a statement sufficiently derogatory to injure his . . . reputation, that is capable of being proved false, and that he . . . claims is false, and (2) a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights."  *Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir. 2004) (internal quotation marks omitted).  According to Plaintiff, "Defendants stigmatized Plaintiff and adversely affected his good name by sharing his private medical records[] and 'denigrating' Plaintiff to a facility manager."  (Pl.'s Opp'n 14 n.1.)  Plaintiff's stigma plus claim fails because he has not alleged "a material state-imposed burden or state-imposed alteration" of his status or rights.  *Sadallah*, 383 F.3d at 38.  Plaintiff was not terminated; the most significant alteration of Plaintiff's rights contained in the Amended Complaint is the allegation that he was suspended without pay for a week.  But such a suspension is not a sufficient burden or alteration as to satisfy the requirements of a stigma plus claim.  *See Patterson v. City of Utica*, 370 F.3d

will be dismissed without prejudice, and Plaintiff can file a Second Amended Complaint that

more clearly alleges the source of his property right and what process he was due but denied.[20]

### 3.  Privacy Claim

Plaintiff alleges that "[b]y revealing sensitive facts relating to Plaintiff's emotional and

physical health, Defendants violated [his] right to privacy under the Constitution."  (Am. Compl.

¶ 89.)  Defendants argue that Plaintiff's right to privacy claim must be dismissed because it is

---

322, 332 (2d Cir. 2004) (finding that two-week dismissal, then re-instatement, was "more
analogous to a suspension than a termination of employment," and thus was not, "as a matter of
law, . . . a significant alteration of [the] plaintiff's employment status"); *Walsh v. Lebanon Bd. of
Educ.*, No. 11-CV-1947, 2013 WL 425092, at *6 (D. Conn. Feb. 4, 2013) ("[C]ase law has
established that a suspension without pay is not sufficient to support a claim of a protected
liberty interest [for a stigma plus claim]."); *Munno v. Town of Orangetown*, 391 F. Supp. 2d 263,
272 (S.D.N.Y. 2005) (finding that suspension without pay did not amount to a deprivation of a
legal status or right sufficient to state a stigma plus claim).  Thus, to the extent Plaintiff has
brought a stigma plus claim, it is dismissed.

[20] It is worth emphasizing that at the Pre-Motion Conference held before the Court on
January 15, 2015, Plaintiff explained that the issuance of the Notice of Discipline and the process
culminating in his punishment were governed by a collective bargaining agreement.  (*See* Conf.
Tr. 9.)  He also told the Court that he was able to grieve the Notice, which led to an arbitration
process, during which he was able to testify before an arbitrator.  (*Id.* at 5, 7–9.)  Plaintiff did not
state that the process in any way failed to comply with the requirements of the collective
bargaining agreement.  The Second Circuit has "held on several occasions that there is no due
process violation where . . . pre-deprivation notice is provided and the deprivation at issue can be
fully remedied through the grievance procedures provided for in a collective bargaining
agreement."  *Adams v. Suozzi*, 517 F.3d 124, 128 (2d Cir. 2008); *see also Harhay v. Town of
Ellington Bd. of Educ.*, 323 F.3d 206, 213 (2d Cir. 2003) (noting that the collective bargaining
agreement governing the plaintiff's employment "established a grievance and arbitration
procedure, [which the plaintiff] took advantage of . . . by filing two grievances . . . and pursuing
arbitration," and that "[c]ourts have held that such post-deprivation procedures, providing for a
hearing to contest a challenged employment decision, are sufficient to satisfy due process").
Thus, any amended complaint "must [contain] allegations that are consistent with what was said
at the [January 15, 2015] Conference as reflected in the [t]ranscript, or otherwise claim that the
[t]ranscript is inaccurate," *Guo v. IBM 401(k) Plus Plan*, 95 F. Supp. 3d 512, 526 n.2 (S.D.N.Y.
2015), and must plead facts alleging that "the grievance procedures in [the] collective bargaining
agreement are an inadequate remedy," *Adams*, 517 F.3d at 128; *see also Harhay*, 323 F.3d at 213
(holding that the plaintiff's due process claim failed because she "[did] not challenge the
adequacy of the process available to her under the [collective bargaining agreement], nor [did]
she argue that any additional process was due").

time-barred.  (*See* Defs.' Mem. 4–5; *see also* Defs.' Reply Mem. 4–5.)  The Court agrees that Plaintiff's privacy claim is time-barred, and it is therefore dismissed.

Although "[t]he lapse of a limitations period is an affirmative defense that a defendant must plead and prove," a statute of limitations defense may be "raise[d] . . . in a pre-answer Rule 12(b)(6) motion if the defense appears on the face of the complaint."  *Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 425 (2d Cir. 2008); *see also Zhongwei Zhou v. Wu*, No. 14-CV-1775, 2015 WL 925962, at *3 (S.D.N.Y. Mar. 3, 2015) (same); *Mosdos Chofetz Chaim, Inc. v. RBS Citizens, N.A.*, 14 F. Supp. 3d 191, 209 (S.D.N.Y. 2014) ("[B]ecause the defendants bear the burden of establishing the expiration of the statute of limitations as an affirmative defense, a pre-answer motion to dismiss on this ground may be granted only if it is clear on the face of the complaint that the statute of limitations has run." (alteration in original) (internal quotation marks omitted)).

When a plaintiff brings an action under § 1983, "courts apply the statute of limitations for personal injury actions under state law."  *Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013); *see also Ormiston v. Nelson*, 117 F.3d 69, 71 (2d Cir. 1997) ("In [§] 1983 actions, the applicable limitations period is found in the 'general or residual [state] statute [of limitations] for personal injury actions.'" (second and third alterations in original)).  The statute of limitations for personal injury actions in New York is three years.  *See Pearl v. City of Long Beach*, 296 F.3d 76, 79 (2d Cir. 2002); *see also* N.Y. C.P.L.R. § 214(5).  "Section 1983 actions filed in New York are therefore subject to a three-year statute of limitations."  *Hogan*, 738 F.3d at 517 (citing, inter alia, *Pearl*, 296 F.3d at 79); *see also Staten v. Vill. of Monticello*, No. 14-CV-4766, 2015 WL 6473041, at *5 (S.D.N.Y. Oct. 26, 2015) (same).  Further, federal law determines when a § 1983 cause of action accrues, and the Second Circuit has ruled that "accrual occurs when the plaintiff

knows or has reason to know of the injury which is the basis of his action." *Pearl*, 296 F.3d at

80 (internal quotation marks omitted); *see also Traore v. Police Officer Andrew Ali Shield*, No.

14-CV-8463, 2016 WL 316856, at *5 (S.D.N.Y. Jan. 26, 2016) (same).

    As applied here, Plaintiff's privacy claim necessarily accrued at some point in March

2011, around the time when Defendants allegedly issued a "One Day Letter" that required

Plaintiff to divulge a physician's diagnosis and a written description of the purposes for which

Plaintiff was seen by his doctor and when Levin "had his secretary scan and e-mail Plaintiff's

doctor's information." (*See* Am. Compl. ¶¶ 48, 50.) *See also Thompson v. City of Mount

Vernon*, No. 93-CV-4788, 1994 WL 561253, at *3 (S.D.N.Y. Oct. 12, 1994) (applying a three-

year statute of limitations to the plaintiff's § 1983 privacy claim).[21]   As Plaintiff did not file his

initial Complaint until July 15, 2014, more than three years after his privacy claim accrued, this

claim is time-barred unless there is a basis for tolling of the statute of limitations.

    "The tolling of the statute of limitations as applied to § 1983 actions is governed by state

tolling provisions." *Mulkern v. N.Y. State Police*, No. 08-CV-8870, 2010 WL 5584598, at *3

(S.D.N.Y. Dec. 8, 2010) (internal quotation marks omitted), *adopted by* 2011 WL 135001

(S.D.N.Y. Jan. 13, 2011); *see also Moses v. Westchester Cty. Dep't of Corr.*, 951 F. Supp. 2d

448, 454 (S.D.N.Y. 2013) (same).   However, courts will rely on federal tolling standards if

application of the state provisions "would be contrary to the federal policy goals of compensation

of persons injured by a deprivation of federal rights and the prevention of abuses of power by

---

[21] Plaintiff's Amended Complaint is not a model of clarity in its description of the medical information Plaintiff actually disclosed and when it was disclosed. (*See generally* Am. Compl. ¶¶ 48–64.)   Even so, the allegations related to medical information all address activity occurring in March 2011. (*See id.*)   Because Plaintiff's privacy claim is untimely by a number of months, the exact dates are not necessary to the Court's decision.

those acting under color of state law underlying [§] 1983." *Moses*, 951 F. Supp. 2d at 454 (internal quotation marks omitted).

Plaintiff argues that his claims are timely under the theories of equitable tolling and the continuing violations doctrine.  (*See* Pl.'s Opp'n 16.)  Neither theory saves Plaintiff's privacy claim.

### a.  Equitable Tolling

Under federal law, equitable tolling of the statute of limitations is applied "as a matter of fairness," *Johnson v. Nyack Hosp.*, 86 F.3d 8, 12 (2d Cir. 1996), but "only in 'rare and exceptional circumstances,' where . . . 'extraordinary circumstances' prevented a party from timely performing a required act, and . . . the party 'acted with reasonable diligence throughout the period he [sought] to toll,'" *Walker v. Jastremski*, 430 F.3d 560, 564 (2d Cir. 2005) (second alteration in original) (quoting *Doe v. Menefee*, 391 F.3d 147, 159 (2d Cir. 2004)); *see also Moses*, 951 F. Supp. 2d at 454 ("[C]ourts in this Circuit deciding [§] 1983 claims have applied the federal equitable tolling standard, which allows tolling where extraordinary circumstances prevented a party from timely performing a required act." (internal quotation marks omitted)). "Generally, a litigant seeking equitable tolling bears the burden of establishing two elements:  (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *A.Q.C. ex rel. Castillo v. United States*, 656 F.3d 135, 144 (2d Cir. 2011) (internal quotation marks omitted); *see also Feliciano v. U.S. Bank Nat'l Ass'n*, No. 13-CV-5555, 2014 WL 2945798, at *6 (S.D.N.Y. June 27, 2014) (same).  The Second Circuit has explained that the type of situation warranting equitable tolling is one "where a plaintiff could show that it would have been *impossible* for a reasonably prudent person to learn about his or her cause of action." *Pearl*, 296 F.3d at 85 (internal quotation marks omitted).

33

Plaintiff argues that he diligently pursued his rights by filing his workers' compensation claim and a request for reasonable accommodation in February 2011.  (*See* Pl.'s Opp'n 16.)  He adds that the "extraordinary circumstance" that "stood in his way" of filing this Action was "his employer['s]" failure "to redress the continuing wrongs alleged in his [Amended] [C]omplaint." (*Id.*)

First, it bears noting that § 1983 claims, outside of those covered by the Prison Litigation Reform Act ("PLRA"), generally do not require exhaustion of administrative remedies before a plaintiff can file suit.  *See Coleman v. Dumeng*, No. 10-CV-8766, 2012 WL 467133, at *3 (S.D.N.Y. Feb. 14, 2012) ("Unlike claims that fall within the PLRA, there is no general requirement that a plaintiff exhaust administrative remedies before filing an action under § 1983."); *see also Rivera-Powell v. N.Y.C. Bd. of Elections*, 470 F.3d 458, 468 n.12 (2d Cir. 2006) ("The general rule is that § 1983 claims . . . do not require exhaustion of state remedies.").  Thus, while the Second Circuit has held that an applicable statute of limitations must be tolled while a prisoner "completes the mandatory exhaustion process," *Gonzalez v. Hasty*, 651 F.3d 318, 323–24 (2d Cir. 2011) (internal quotation marks omitted), this rule is inapplicable to Plaintiff's administrative grievance efforts, *see Coleman*, 2012 WL 467133, at *3.

But even if Plaintiff's efforts at administratively vindicating his rights were considered, the result would be the same.  Plaintiff's underlying premise, that he "trusted his employer to redress the continuing wrongs alleged in his [Amended] [C]omplaint," (Pl.'s Opp'n 16), is faulty.  His workers' compensation claim and request for reasonable accommodation (*see* Am. Compl. ¶¶ 33, 41), did not aim to vindicate the claims he pursues in this Action—specifically, violations of his rights to procedural due process, privacy, and free speech, *see Russell v. Cty. of Nassau*, 696 F. Supp. 2d 213, 229–30 (E.D.N.Y. 2010) (rejecting the "[p]laintiff's equitable

tolling argument premised on the claim 'that he acted with reasonable diligence during the time period he seeks to have tolled as he actively sought relief from within the [collective bargaining agreement] [g]rievance procedures and [the defendant county] administration,'" because "[t]he issues presented in the grievances . . . [were] not coextensive with the claims herein"). Moreover, Plaintiff attempts to place blame for his late filing on Defendants, but he does not allege *any* facts indicating that Defendants "engaged in conduct . . . that concealed from . . . [P]laintiff the existence of the cause of action." *Veltri v. Building Serv. 32B-J Pension Fund*, 393 F.3d 318, 323 (2d Cir. 2004) (internal quotation marks omitted). Plaintiff has thus not plausibly alleged that equitable tolling is appropriate in this case. *See Guo v. IBM 401(k) Plus Plan*, 95 F. Supp. 3d 512, 527 (S.D.N.Y. Mar. 26, 2015) ("[T]o benefit from equitable tolling, a litigant must allege that extraordinary circumstances prevented him from acting in a timely manner." (internal quotation marks omitted)); *Chao v. Xanadu Boutique, Inc.*, 380 F. Supp. 2d 134, 136 (E.D.N.Y. 2005) (dismissing claim without prejudice where "[the] plaintiff fail[ed] to plead in the complaint circumstances that justify equitable tolling").[22]

### b. Continuing Violation Doctrine

Plaintiff also relies on the continuing violation doctrine to thwart Defendants' Motion. Traditionally, the continuing violation doctrine applies when a "plaintiff brings a [§] 1983 claim challenging a discriminatory policy," and it acts to delay the commencement of the limitations period "until the last discriminatory act in furtherance of [the discriminatory policy]." *Shomo v. City of N.Y.*, 579 F.3d 176, 181 (2d Cir. 2009) (internal quotation marks omitted); *see also*

---

[22] The same is true for the analogous New York state doctrine, "equitable estoppel," which "cover[s] [situations] . . . where the defendant conceals from the plaintiff the fact that he has a cause of action [and] where the plaintiff is aware of his cause of action, but the defendant induces him to forego suit until after the period of limitations has expired." *Pearl*, 296 F.3d at 82 (fourth alteration in original) (internal quotation marks omitted).

*Harris v. City of N.Y.*, 186 F.3d 243, 248 (2d Cir. 1999) (explaining that the continuing violation doctrine is an "exception to the normal knew-or-should-have-known accrual date of a discrimination claim when there is evidence of an ongoing discriminatory policy or practice" (internal quotation marks omitted)); *cf. J.S. v. Killian*, No. 11-CV-103, 2015 WL 4475358, at *8 (S.D.N.Y. July 22, 2015) (noting that the continuing violation doctrine is "native to the context of hostile work environment claims under Title VII"). However, the doctrine has been applied outside of the discrimination context, including in cases involving *Bivens* or § 1983 claims other than ones founded on allegations of discrimination. *See, e.g.*, *Shomo*, 579 F.3d at 182 (holding that "the continuing violation doctrine can apply when a prisoner challenges a series of acts that together comprise an Eighth Amendment claim of deliberate indifference to serious medical needs"); *J.S.*, 2015 WL 4475358, at *9 (noting that "the continuing violation doctrine can apply to *Bivens* cases as a general matter" and finding that the plaintiff could "plead sufficient facts to make the continuing violation doctrine available to him" for his due process claims).

"That the continuing violation doctrine *can* apply, however, does not mean it must." *Shomo*, 579 F.3d at 182. The doctrine applies only to claims "composed of a series of separate acts that collectively constitute one unlawful practice." *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015) (alteration and internal quotation marks omitted). The doctrine "thus applies not to discrete unlawful acts, even where those discrete acts are part of a serial violation, but to claims that by their nature accrue only after the plaintiff has been subjected to some threshold amount of mistreatment." *Id.* (alteration and internal quotation marks omitted); *see also Shomo*, 579 F.3d at 181 (same). Because Plaintiff's privacy claim challenges one or two discrete, allegedly unlawful acts outside the limitations period—Defendants' demands that Plaintiff turn over medical information and Levin's directive to his secretary that she scan Plaintiff's doctor's

information—he cannot avail himself of the continuing violation doctrine.  *See Gonzalez v. City of N.Y.*, No. 14-CV-7721, 2015 WL 6873451, at \*4 (S.D.N.Y. Nov. 9, 2015) ("The continuing violation doctrine does not apply to claims against [certain defendants,] as the claims arise out of discrete acts, not continuing violations."); *Munsch v. Evans*, No. 11-CV-2271, 2012 WL 528135, at \*13 (E.D.N.Y. Feb. 17, 2012) (finding continuing violation doctrine unavailable where the plaintiff challenged "a singular event"); *Rodriguez v. Mount Vernon Hosp.*, No. 09-CV-5691, 2011 WL 3874814, at \*2 (S.D.N.Y. Sept. 2, 2011) (rejecting the plaintiff's reliance on the continuing violation doctrine where his claim was "based on a single, allegedly incorrect surgical procedure and not 'a series of separate acts that collectively constitute one unlawful act'" (alteration omitted) (quoting *Shomo*, 579 F.3d at 181)).[23]

The three-year statute of limitations governing Plaintiff's § 1983 privacy claim began to run no later than March 2011 and had expired by the time Plaintiff filed this Action in July 2014.

---

[23] Moreover, both discrete acts that Plaintiff challenges occurred outside of the limitations period and thus Plaintiff also cannot make the required showing that there were "some non-time barred acts taken in furtherance of" any policy.  *Shomo*, 579 F.3d at 182 (internal quotation marks omitted); *see also Munsch*, 2012 WL 528135, at \*14 (holding that continuing violation doctrine is inapplicable because the plaintiff could not "show that there is some non-time barred act," given that "he suffered one act" that occurred outside of the limitations period).

Similarly, to the extent Plaintiff seeks to toll his privacy claim under New York's "continuing wrong" or "continuing violation" doctrine, such an effort would be unsuccessful because "[t]he continuing wrong doctrine does not apply unless a defendant's wrongful acts continue after the limitations period has begun."  *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, MDL No. 1358, No. M21-88, 2007 WL 1601491, at \*15 (S.D.N.Y. June 4, 2007), *reconsideration granted on other grounds*, 2007 WL 2936214 (S.D.N.Y. Oct. 4, 2007); *see also Thomas v. City of Oneonta*, 934 N.Y.S.2d 249, 251 (App. Div. 2011) ("[T]he continuing violation doctrine does not operate to toll . . . the . . . limitations period[]" because the acts complained of "constitute single and distinct events" that occurred outside the limitations period); *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 41 (App. Div. 2009) (finding "continuing violation doctrine" inapplicable where "pre-limitation period [conduct] was not joined to [any] actionable conduct within the limitation period"); *Selkirk v. State*, 671 N.Y.S.2d 824, 825 (App. Div. 1998) (rejecting continuing violation argument because the doctrine "may only be predicated on continuing unlawful acts and not on the continuing effects of earlier unlawful conduct").

Because Plaintiff is not entitled to tolling of the statute of limitations, his privacy claim is dismissed.

## III. Conclusion

In light of the foregoing analysis, the Court grants Defendants' Motion To Dismiss the Amended Complaint in its entirety. In light of Plaintiff's pro se status, and because this is the first adjudication of Plaintiff's claims on the merits, the Amended Complaint is dismissed without prejudice. Plaintiff is given 30 days to file a Second Amended Complaint. Failure to honor this deadline could result in dismissal of this Action with prejudice. The Clerk of Court is respectfully requested to terminate the pending Motion. (Dkt. No. 20.)

SO ORDERED.

DATED:     March 3 , 2016
           White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

38